UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FREDA  HALL,                          )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        No.  4:11CV1283 ERW
                                      )                    (TIA)
MICHAEL J. ASTRUE,                    )
COMMISSIONER OF SOCIAL SECURITY,      )
                                      )
        Defendant.                    )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves an Applications for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security income payments.

**I.    Procedural History**

Claimant Freda M. Hall filed Applications for Disability Insurance Benefits under Title II

of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 157-63)[1] and Supplemental Security Income payments

pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 164-80).

Claimant states that her disability began on July 1, 2008, as a result of a heart problem.  (Tr. 224).

On initial consideration, the Social Security Administration denied Claimant's claims for benefits.

(Tr. 80-84).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 87-

88).  On March 24, 2010, a hearing was held before an ALJ.  (Tr. 22-67).  Claimant testified and

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 11/filed October 11, 2011).

was represented by counsel.  (Id.).  Medical Expert Dr. Morris Alex and Vocational Expert Susan Shay also testified at the hearing.  (Tr. 55-67, 96-97, 147-48).  Thereafter, on April 26, 2010, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 8-21).  After considering the additional medical records from Barnes Jewish Hospital and the representative brief, the Appeals Council on May 24, 2011 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 1-5, 243-45, 374-432).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on March 24, 2010

#### 1.  Claimant's Testimony

At the hearing on March 24, 2010, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 27-54).  Claimant lives in a house with a basement with her husband, sister-in-law, and her three children.  (Tr. 27).  To enter the house, Claimant has to climb ten steps.  (Tr. 27).  Claimant has two children ages seventeen and eighteen.  (Tr. 28).  At the  time of the hearing, Claimant was thirty-eight years of age.  Claimant is left-handed.  Claimant stands at five feet seven inches and weighs 297 pounds.  Claimant's son drove her to the hearing, because she does not drive.  (Tr. 28).  Claimant testified that she stopped driving in February 2009 because of fatigue.  (Tr. 29).  Claimant receives $114 a week in unemployment benefits.  (Tr. 29).  Claimant also receives disability benefits for her son and $526 in  food stamps.  (Tr. 30). Claimant does not have medical insurance.  (Tr. 30).  Claimant completed the eleventh

grade. (Tr. 30). In June 2008, Claimant injured her back on the job and filed a workman's compensation claim and received $6,000. (Tr. 30-31).

Claimant last worked on February 16, 2009. (Tr. 31). Before Claimant stopped working, she worked for Algonquin Nurses for six years as a full time private duty nurse. (Tr. 31-32). The ALJ inquired about Claimant's onset date of disability being July 1, 2008. (Tr. 32). Claimant explained how she was in the hospital for three days in July 2008 for atrial fibrillation. (Tr. 33). Claimant testified that she returned to work in December 2008 and stopped working in February 2009 when her heart went A-Fib. (Tr. 34-35). As a private duty nurse, Claimant lifted patients. (Tr. 34). Inasmuch as the job did not offer light duty, Claimant testified that she could no longer work. (Tr. 35). Claimant testified that she could return to her job when her health permitted. (Tr. 35). Claimant thereafter attempted to find a desk job through a temp service. (Tr. 36).

In 1989 through 1991, Claimant worked as a cook in a fast food restaurant. (Tr. 39-40). Claimant was promoted to shift leader and supervised five cashiers, two cooks, and a maintenance person. (Tr. 40). Claimant worked as a clerical for Workforce in 1990. (Tr. 39). From 1993 through 1996, Claimant worked as a cashier at a fast food restaurant and lifted boxes of meat weighing ten pounds. (Tr. 38-39). In 1994, Claimant worked in a school cafeteria and lifted boxes weighing twenty pounds. (Tr. 37-38). Next, Claimant worked as a cashier counting money for vendors at the ballpark from 1996 through 2002. (Tr. 38). Claimant lifted cash bags weighing five pounds. (tr. 38). In 2000, Claimant worked in a warehouse on a machine in a temp position. (Tr. 41).

Claimant testified that she takes medication for a heart condition, and Metoprolol for blood pressure and iron pills. (Tr. 33). Claimant takes aspirin as a blood thinner. (Tr. 47). Claimant started taking digoxin in February, 2009. (Tr. 48). Claimant testified that she received the diagnosis of atrial fibrillation in 1997. (Tr. 48). Claimant has not been on a heart monitor since leaving the hospital. (Tr. 49). Claimant testified that movement causes her to be short of breath. (Tr. 50). Claimant testified that her heart is the only physical condition preventing her from being able to work. (Tr. 50). Claimant's medications cause her to have headaches. (Tr. 51). Claimant takes Tylenol PM for her headaches. (Tr. 51). Claimant testified that she can work for three to six months but then she has A-Fib. (Tr. 54).

Claimant testified that she can sit in a chair okay and can stand for forty-five minutes. (Tr. 51). Claimant can lift five pounds and walk a short distance. Bending, stooping, crouching, kneeling, and crawling cause Claimant to be short of breath. (Tr. 51). Walking down steps requires Claimant to immediately sit down. (Tr. 52). Claimant testified that if she sits down for forty-five minutes, she has to elevate her feet for circulation to prevent swelling. (Tr. 52).

Claimant wakes up around 6:15 in the morning and takes her medication and eats breakfast. (Tr. 41). Claimant sits and watches television. Claimant does not do any housework, because she becomes short of breath. Claimant makes a sandwich for lunch. (Tr. 41). Claimant's husband does the laundry and makes the bed. (Tr. 42). Her sister-in-law does the shopping. (Tr. 43). Claimant testified that she watches a lot of television and reads her Bible. (Tr. 42-43). Claimant has a prayer partner and attends church. (Tr. 44).

## 2. Testimony of Medical Expert

Medical Expert Dr. Morris Alex listened to the hearing testimony and reviewed Claimant's medical record. (Tr. 55-62). Dr. Alex opined that there was sufficient evidence in the record to allow him to form an opinion regarding Claimant's medical status. (Tr. 57).

Dr. Alex asked Claimant why she did not return to St. Louis Connect Care or Grace Hill for her medications and follow-up treatment as recommended by the emergency room doctor at Barnes. (Tr. 57). Claimant testified that lack of insurance and funds precluded her from receiving treatment. Dr. Alex noted that both Connect Care and Grace are free clinics, and Claimant could have received medications refills. (Tr. 57-58). Dr. Alex also testified that Claimant could have had the pulmonary function studies completed at one of the clinics for free. (Tr. 58). Claimant testified that she was not aware of the clinics being free. (Tr. 58). In response to Dr. Alex's question regarding whether Claimant had been following the nutritional counseling about weight loss, Claimant noted that she is on a low sodium diet. (Tr. 58).

Dr. Alex listed increased blood pressure as one of Claimant's physical impairments. (Tr. 59). Dr. Alex noted how the October 23, 2007 Barnes Hospital record notes Claimant not having a prescription for six months, and the emergency room doctor referring Claimant to St. Louis Connect Care. Later in the record, Claimant's blood pressure is noted to be under control. (Tr. 59). Dr. Alex noted that Claimant's last blood pressure reading to be okay. (Tr. 60). Next, Dr. Alex discussed Claimant's ischemic heart disease. The results of dobutamine exercise stress test showed no ischemia, and the left ventricular ejection infraction to be low normal. The October 23, 2007 ECO showed left atrial enlargement. Dr. Alex noted that with Claimant's height and weight, her body mass index is 50, a marked level 3. Next, with respect to recurrent arrhythmias,

Claimant has had recurrent palpitations for years when not taking medications. (Tr. 60). Dr. Alex noted that Dr. Park treated Claimant on May 6, 2009 and found her rhythm to be regular and her blood pressure to be normal. (Tr. 61). Dr. Alex noted Claimant does not meet the listing requirements for 4.05, recurrent arrhythmia, and Claimant needs to lose weight and continue her medications. In response to the ALJ's question regarding whether there are any specific functional exertional restrictions for a patient in this particular condition, Dr. Alex opined that such patient should be capable of light work and the only limits imposed would be because of her weight. Dr. Alex further noted that such person would be at the low level of light work and closer to sedentary work because of her weight. Dr. Alex explained that if Claimant lost weight, she would be capable of light work. (Tr. 61).

### 3. Testimony of Vocational Expert

Vocational Expert Susan Shay testified in response to the ALJ's questions. (Tr. 62-67). Ms. Shay noted that the region for this case is Missouri. (Tr. 62). Ms. Shay testified that Claimant's past work included the following jobs: a fast food worker, DOT 311.472-010, light, unskilled work; shift manager fast food, DOT 189.167-018, light, skilled work; vending machine cash collector, DOT 292.483-010, medium work, lowest level, semi-skilled work based on Claimant's testimony light work; and a nurse's assistant, DOT 355-674-014, medium, semi-skilled work based on Claimant's testimony, heavy work. (Tr. 63-64).

The ALJ asked Ms. Shay to assume

a person at the age of 38, with a limited education and past relevant work experience that you have identified. Please assume I would find this person capable of performing exertional demands and light work, as defined in the Social Security regulations, specifically, a person would lift, carry, push, pull, 20 pounds occasionally, 10 pounds frequently, sit, stand, walk each six out of eight, for a total

of eight out of eight. I would limit the person to occasional climbing, no exposure to ladders, ropes, scaffolds, moving machinery, unprotected heights. Regarding the hypothetical, would there by any transferable work skills?

(Tr. 64). Ms. Shay responded that there would not be any transferable work skills. (Tr. 64). In response to being asked whether these restrictions would effect the performance of past relevant work, Ms. Shay noted that such individual could return to the vending machine cash collector job as performed by Claimant, the shift manager job, and the fast food job. (Tr. 65). Ms. Shay testified that in Missouri, there are 20,000 fast food worker jobs, and at the managerial level, there would be 5,000 jobs. (Tr. 65).

Next, the ALJ asked Ms. Shay to assume

a person with the age of 38, with a limited education in the past relevant work experience you have identified. At this time, please assume I would find this person capable of performing exertional demands of sedentary light work, as defined in the Social Security regulations, specifically, a person would lift, carry, push, pull, 10 pounds occasionally and frequently, sit, stand, and walk each six out of eighty-four[*sic*] a total of eight out of eight, I will limit the person to occasional climb, no ladders, ropes, or scaffolds, nor moving machinery or protected heights. I assume again there would be no transferable work skills?

(Tr. 65-66). Ms. Shay concurred. (Tr. 66). Ms. Shay opined that such individual would not be able to perform past relevant work. As examples of other jobs an individual with such restrictions could perform, Ms. Shay listed a product finisher, DOT 731.687-014 with 6,000 jobs in Missouri; charge counselor, DOT 205.367-014 with 5,500 jobs in Missouri; and a machine worker/machine tender jobs, DOT 715.685-050 with 5,400 jobs in Missouri. (Tr. 66).

Claimant's counsel asked whether any of the jobs in response to the second hypothetical would permit Claimant to elevate her feet at any time if needed. (Tr. 67). Ms. Shay indicated that potentially this could be done but that such need would represent modified work. (Tr. 67).

### 3. Forms Completed by Claimant

In the Disability Report - Field Office, the examiner noted that Claimant stopped working in July 2008 because of her condition, but then Claimant returned to work in December 2008 through January 2009 and part of February 2009. (Tr. 192). Claimant stopped working again in February 2009 due to her condition. (Tr. 192).

In the Work Activity Report - Employee, Claimant reported working fewer hours as a special work condition from December 2008 through February 2009. (Tr. 196-203).

In the Function Report - Adult - Third Party completed on March 23, 2009, Claimant reported taking care of her children and going shopping for food and house supplies once every two weeks. (Tr. 215-22). Claimant's interests include listening to music and watching television, and her social activities include sitting and talking and going to church once a week. (Tr. 219).

In the Disability Report - Adult, Claimant listed her heart problem as the condition limiting her ability to work. (Tr. 223-32). Claimant reported always being out of breath, having fainting spells, and being weak. (Tr. 224). Claimant reported last working on February 16, 2009 and stopping because of a hospitalization. (Tr. 224).

## III. Medical Records

On August 1, 2007, Claimant received treatment for back pain in the emergency room at Barnes Hospital. (Tr. 261). The nurse found Claimant to have good air exchange bilaterally and her respirations to be unlabored. Claimant reported injuring her left shoulder and lower back at work when she caught a patient falling. (Tr. 262). Claimant reported not taking any medications at that time. (Tr. 262). Examination showed tenderness in her lower back. (Tr. 263). The

treating doctor prescribed medications as treatment.  The nurse noted that Claimant has no respiratory distress.  (Tr. 262).  The doctor diagnosed Claimant with back and shoulder strain and hypertension.  (Tr. 265).

On October 23, 2007, Claimant received treatment for hypertension in the emergency room at Barnes Hospital.  (Tr. 247, 410).  Claimant reported having a headache for one month and not taking her blood pressure medications for six months.  Claimant indicated that she does not have a primary care physician.  (Tr. 247, 410).  Dr. Mark Levine examined Claimant and found her heart rate to be regular and her breathing to be unlabored.  (Tr. 248, 411).  Dr. Levine observed Claimant to move all extremities well and to have no edema.  Claimant reported not being able to afford medications and not being on her husband's insurance.  Claimant has not had any medications for several weeks.  (Tr. 248, 411).  During a routine office visit, the doctor found Claimant's blood pressure to be high and sent her for treatment in the emergency room.  (Tr. 251, 414).  Dr. Levine noted Claimant does not have chest pain or trouble breathing.  Claimant reported the headache relieved by taking ibuprofen.  (Tr. 251, 414).  Examination showed Claimant's lungs to be clear and equal to auscultation bilaterally and a regular heart rate and rhythm.  (Tr. 252, 415).  Dr. Levine prescribed Clonidine, Hydralazine, and Ibuprofen.  (Tr. 253, 416).  The radiology report of Claimant's chest revealed no focal consolidation, effusion, or pneumothorax, and the cardiac size to be normal.  (Tr. 257, 275, 420).  Dr. Levine diagnosed Claimant with hypertension and directed Claimant to receive follow-up treatment at St. Louis Connect Care or Grace Hill Neighborhood Health Center.  In the discharge note, the nurse noted that Claimant has no respiratory distress.  (Tr. 257, 420).

On November 22, 2007, Claimant received treatment in the emergency room at Christian Hospital Northeast for rapid heartbeat. (Tr. 293). Dr. Scott Schepker noted no edema and placed Claimant on a cardiac monitor. (Tr. 294). The chest radiography showed no acute pulmonary disease. (Tr. 292). Dr. Schepker noted Claimant's respirations to be even and unlabored. (Tr. 294). Claimant reported running out of medications because she has no money or insurance. (Tr. 295). Claimant denied shortness of breath. Dr. Schepker educated Claimant on the importance of taking her medications. (Tr. 295). Dr. Schepker started Claimant on Cardizem. (Tr. 303). The cardiology examination showed an irregular heart rate and rhythm. (Tr. 306). Dr. Schepker noted Claimant to have a normal respiratory effort. (Tr. 306). Dr. Schepker diagnosed Claimant with a atrial fibrillation and admitted Claimant to the hospital. (Tr.315-16).

On November 23, 2007, Claimant was admitted to Christian Hospital Northeast for an atrial fibrillation. (Tr. 287). The echocardiography showed Claimant's upper normal left atrial size with mild mitral regurgitation, but otherwise a normal echo and Doppler study. (Tr. 288-89). In the consultation, Dr. Lalith Chouhan noted Claimant to have a history of recurrent palpitations over the years and a history of hypertension. (Tr. 290). Although Claimant is supposed to be taking medications, Claimant reported not being able to afford medications. Claimant sought treatment in the emergency room and was found to be in rapid atrial fibrillation and was admitted. The EKG showed atrial fibrillation with rapid rate. Dr. Chouhan found Claimant to have paroxysmal atrial fibrillation and hypertension. (Tr. 290). Dr. Chouhan prescribed Cardizem. (Tr. 291). Claimant promised to follow-up at her clinic and stay compliant with her medications. (Tr. 291).

In the December 18, 2007 initial assessment at Saint Louis Connect Care, Claimant received treatment for atrial fibrillation. (Tr. 330). Claimant reported having this condition since 1996. (Tr. 331). Claimant reported increased racing of her heart in the last six months and having bad headaches. The cardiologist advised Claimant to be compliant with her medications. (Tr. 331).

On February 20, 2009, Claimant received treatment in the emergency room for palpations. (Tr. 339-40). The doctor noted Claimant's respiratory to be unlabored. (Tr. 340). Claimant reported not taking medications for over one year. (Tr. 348). Claimant experienced palpations and chest pain while watching television. (Tr. 348). Claimant reported feeling better. (Tr. 350). The doctor admitted Claimant for evaluation of arrhythmias. (Tr. 351). The doctor diagnosed Claimant with atrial fibrillation. (Tr. 354). .

In the February 24, 2009 discharge summary, atrial fibrillation with rapid ventricular response and anemia were listed as Claimant's principal and secondary diagnosis. (Tr. 335). Claimant's chief complaint was palpitations. Claimant reported having palpitations and chest pressure. Claimant reported not taking any medications for the last year. Claimant had been taking diltiazem, but she stopped taking the medication secondary to headaches. Claimant denied having any current episodes of palpitations between November 2007 and February 24, 2009. Claimant denied experiencing shortness of breath or lower extremity edema. (Tr. 335). In the past medical history, Dr. Abhinav Diwan noted that Claimant received treatment in November 2007 for atrial fibrillation secondary to not being on medication. (Tr. 335). The November 2007 echocardiogram showed the left atrium to be the upper limits of normal in size with mild mitral

regurgitation.  (Tr. 336).  Examination showed Claimant's heart to be irregularly irregular with no murmurs.  The EKG showed atrial fibrillation with rapid ventricular response.  Dr. Diwan noted that Claimant's heart rate initially improved after several doses of diltiazem.  After several days of metoprolol therapy, Claimant's heart rate was persistently elevated so Dr. Diwan also prescribed digoxin.  Dr. Diwan noted that Claimant's heart rate responded to the combination therapy.  (Tr. 336).  Dr. Diwan noted Claimant remained in atrial fibrillation during her entire hospitalization and, at the time of discharge, Claimant was still in atrial fibrillation.  (Tr. 337).  Aspirin, digoxin, iron sulfate, and metoprolol were Claimant's discharge medications.  (Tr. 337).

In the March 9, 2009 clinic note, Claimant reported being able to purchase and prepare balanced meals.  (Tr. 267).  In the functional section, Claimant reported no difficulty in walking or with activities of daily living including cooking, cleaning, shopping and driving.  (Tr. 267).  The doctor found Claimant to have normal respiratory effort.  (Tr. 269).  The doctor noted that Claimant was due for her next dose of metoprolol, but Claimant admitted that she did not have the medication with her.  (Tr. 270).  Although the doctor advised Claimant to go to the emergency room for blood pressure management, Claimant declined to go.  Claimant indicated that she would go home and take her medication and then check her blood pressure reading and determine if she needed additional medical care.  The doctor noted that Claimant's A-fib to be a normal rate and ordered Claimant to continue her medications.  (Tr. 270).  In the new patient health risk screening, the interviewer noted Claimant does not have any difficulty walking or with activities of daily living.  (Tr. 401).

During the annual breast exam and evaluation of menorrhagia on March 9, 2009, the doctor noted Claimant to have normal respiratory effort and clear to auscultation bilaterally.  (Tr.

395-98). Cardiovascular examination revealed normal heart sounds, no murmurs, and normal peripheral vascular. (Tr. 398). The doctor counseled Claimant about diet and exercise and on gradual increase in activity as tolerated. (Tr. 398).

On March 11, 2009, Claimant returned for assessment of A-fib at Barnes Jewish Hospital. (Tr. 387). Claimant reported persistent fatigue and headaches. (Tr. 388). The doctor opined given Claimant's history of A-fib, there is a concern for cardiac etiology. (Tr. 389).

The March 19, 2009 dobutamine stress echo revealed normal results, and no significant valvular abnormalities. (Tr. 272, 383-84).

On May 6, 2009, Dr. Inna Park completed an evaluation of Claimant. (Tr. 368). Claimant reported generalized fatigue and weakness due to atrial fibrillation. Since becoming compliant on her medications in February 2009, Claimant has experienced fewer episodes of palpations. Claimant reported having two episodes. (Tr. 368). Cardiac examination showed regular rate and rhythm. (Tr. 369). Dr. Park observed no edema of Claimant's extremities. In the clinical impression, Dr. Park noted paroxysmal atrial fibrillation with some resolution of symptoms due to recent medical compliance. (Tr. 369).

On May 13, 2009, Claimant returned to Barnes Jewish Hospital for follow-up treatment. (Tr. 377-78). Claimant reported being able to go up one flight of stairs but then needing to rest. (Tr. 378). Claimant had one episode of palpitations lasting for about ten minutes. (Tr. 378). The doctor indicated an interest in obtaining pulmonary etiology but not doing so due to Claimant's lack of insurance. (Tr. 379). Claimant reported experiencing dyspnea since her hospitalization. The doctor noted that a recent stress echo was negative for ischemia or congestive heart failure, and Claimant to be morbidly obese. The doctor indicated that he would refer Claimant to a sleep

clinic for a sleep study if the study revealed normal results, he would recommend a pulmonary function test. The doctor noted that Claimant is taking metoprolol once a day for A-fib, and Claimant to be regular on the day of treatment. (Tr. 379).

During a follow-up visit on May 27, 2009 for treatment of menorrhagia, Claimant denied having any palpitations. (Tr. 425-26).

On September 21, 2009, Claimant returned for a routine visit at the Barnes clinic and reported feeling tired all the time and having decreased energy. (Tr. 428-30). Claimant denied having any palpitations or chest pain and reported being compliant with medications. (Tr. 429).

On February 28, 2010, Claimant reported having more frequent and persistent headaches. (Tr. 431). The doctor noted Claimant's A-fib to be normal on that day and altered her medication regimen. (Tr. 432).

The non-examining consultant, Angela Hickerson, with the Missouri Section of Disability Determination, completed a Physical Residual Functional Capacity Assessment ("PRFCA") on May 22, 2009. (Tr. 75). Ms. Hickerson listed Claimant's primary diagnosis to be atrial fibrillation and her secondary diagnosis to be obesity. (Tr. 69). The examiner indicated that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and stand and walk about six hours in an eight-hour workday. (Tr. 70). The consultant noted that Claimant can sit about six hours in an eight-hour workday and has limited capacity to push and/or pull. (Tr. 70). The consultant noted Claimant's postural limitations to be limited to never balancing, and occasionally climbing ramp/stairs. (Tr. 72). The examiner indicated that Claimant has no established visual, manipulative, or communicative limitations. (Tr. 72-73). With respect to environmental limitations, the examiner found Claimant should avoid extreme heat. (Tr. 73). In support, the

examiner noted how Claimant reported her symptoms have improved since becoming compliant on medication. (Tr. 74).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the special earnings requirements of the Act as of July 1, 2008, the alleged onset of disability, and continued to meet them through the date of the decision. (Tr. 17). Claimant has not engaged in substantial gainful activity since July 1, 2008, although she worked as a nurse's aide from December 2008 to February 2009, but such work failed to meet the duration or amounts of average monthly earnings to constitute substantial gainful activity. The ALJ found that the medical evidence establishes that Claimant has the impairments of obesity, hypertension, iron deficiency anemia, and atrial fibrillation, controlled by medication, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ opined that Claimant's allegation of impairments producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible. The ALJ found that Claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than ten pounds; climbing of ropes, ladders, or scaffolds; doing more than occasional climbing of ramps and stairs; or having concentrated or excessive exposure to extreme heat or dangerous moving machinery. The ALJ found Claimant cannot perform any of her past relevant work, and her residual functional capacity for the full range of sedentary work to be reduced by the limitations set forth. (Tr. 17). Claimant is a younger individual with a limited eleventh grade education, but she is literate and able to communicate in English. (Tr. 18). Based on an

exertional functional capacity for sedentary work, her age, education, and work experience, the ALJ found Claimant not to be disabled. The ALJ found that although Claimant's limitations do not allow the performance of the full range of sedentary work, there are a significant number of jobs in the local and national economies she could perform including unskilled sedentary jobs as a charge account clerk, machine tender, and light production assembler according to the vocational expert's opinion. (Tr. 18).

## V. Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC is not supported by any medical evidence. Claimant also contends that the ALJ's hypothetical question to the vocational expert failed to capture the concrete consequences of her impairment.

A.     Residual Functional Capacity

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC is not supported by any medical evidence.

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766,

768 (8th Cir. 2003); <u>McKinney v. Apfel</u>, 228 F.3d 860 863 (8th Cir. 2000) (citing <u>Anderson v.</u>

<u>Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw

meaningful inferences and allow reasonable conclusions about the individuals's strengths and

weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ...

the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to

others *over a period of time*" and that the "frequency, appropriateness, and independence of the

activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the

credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function.

<u>See</u> <u>Anderson v. Barnhart</u>, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is

primarily a matter for the ALJ to decide); <u>Pearsall</u>, 274 F.3d at 1218. In making a credibility

determination, an ALJ may discount subjective complaints if they are inconsistent with the record

as a whole. <u>Holstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a

claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); <u>Polaski v.</u>

<u>Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). In <u>Polaski</u>, the Eighth Circuit set out factors for

an ALJ to consider when determining the credibility of a claimant's subjective complaints. The

ALJ must make express credibility determinations detailing the inconsistencies in the record that

support the discrediting of the claimant's subjective complaints. <u>Singh v. Apfel</u>, 222 F.3d 448,

452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of <u>Polaski</u> to insure

safe passage for his or her decision through the course of appellate review." <u>Harris v. Shalala</u>, 45

F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not

required to discuss each <u>Polaski</u> factor methodically. The ALJ's analysis will be accepted as long

as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record.").

The ALJ's determination of Claimant's RFC is supported by substantial evidence in the record. Likewise, the ALJ noted several inconsistencies within the record, and he pointed out the lack of supporting objective medical evidence, gap in medical treatment, and Claimant's noncompliance with medications.[2] The ALJ opined that the medical record does not show that

[2]Although Claimant asserts that she was unable to afford testing and medications, the record is devoid of evidence suggesting that Claimant was denied treatment offered to indigents. See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability). Except for the notations in the treatment notes, the record does not document that Claimant was ever refused treatment due to insufficient funds. See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits); Murphy, 953 F.2d at 386. The fact that a claimant is under financial strain, however, is not determinative. Id. Here, as the ALJ points out, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances and thus inferred that Claimant did not seek more frequent medical treatment more often, because she did not have a medical need for such treatment. Case law permits the ALJ's reasonable inferences. See Pearsall v. Massanari, 274 F.3d 1218. Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription pain medications on account of financial constraints. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).

any physician imposed any functional restrictions of Claimant or found her to be totally disabled.[3]

Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant. The ALJ also properly considered the Polaski factors in concluding that Claimant's subjective complaints of pain and discomfort are not supported by the objective medical evidence. The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform sedentary work such as the lack of ongoing medical treatment and gap in medical treatment. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Those included the absence of objective medical evidence of deterioration, the absence of any doctor finding Claimant disabled or imposing any functional limitations, her failure to seek regular and sustained treatment, history of noncompliance, and working after the alleged date of disability.

Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform unskilled sedentary work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than ten pounds; climbing of ropes,

---

[3]It is important to note that all of Claimant's examining doctors were aware of her obesity, but none of the doctors who examined Claimant provided an opinion or imposed limitations greater than that identified by the ALJ. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.").

ladders, or scaffolds; doing more than occasional climbing of ramps and stairs; or having concentrated or excessive exposure to extreme heat or to unprotected heights or dangerous moving machinery. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform unskilled sedentary work as limited. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant has the residual functional capacity to perform sedentary work except as set forth. The ALJ thus concluded that Claimant could not perform any of her past relevant work, but she would be able to meet the demands of unskilled sedentary work as limited in the RFC.

Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). Indeed, at the hearing Claimant testified that she returned to work in December 2008 and stopped working in February 2009 when her heart went A-Fib. See Lindsay v. Astrue, No 08cv892GAF, 2009 WL 2382337, at *3 (W.D. Mo. July 30, 2009) ("Plaintiff reported looking for work and contacting temporary agencies. These statements are inconsistent with disability and indicate that Plaintiff did not view his pain as disabling."). "'[A] cts which are inconsistent with a claimant's assertion of disability reflect

negatively upon the claimant's credibility.'" Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).  Such acts include looking for work.  See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) ("[T]his record of contemplating work indicates [the claimant] did not view his pain as disabling.").  Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.  See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability).

The ALJ also discussed Claimant's history of noncompliance, noting that her impairments have been well controlled by medications when she is compliant.  When she was compliant, Claimant reported feeling better.  The ALJ also noted how Claimant failed to seek regular medical treatment.  See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against a claimant's credibility).  If the ALJ finds that the claimant has not been compliant with prescribed medical treatment, the ALJ is justified in disregarding the claimant's subjective testimony regarding her disability.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may consider noncompliance with medical treatment in decision to dispense with claimant's subjective complaints).  Claimant attributed this failure to a lack of insurance and money.  The lack of sufficient financial resources to follow prescribed or recommended treatment or to pursue such treatment to remedy a disabling impairment may be "justifiable cause" for such noncompliance.  Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir.

2004).  In order to be such cause, there must be evidence that the claimant was denied medical

treatment due to financial reasons.  Goff, 421 F.3d at 793.  See also Murphy v. Sullivan, 953 F.2d

383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no

evidence that claimant had attempted to obtain low cost medical treatment or had been denied

care because of inability to pay).  Such evidence is lacking in this case.  Claimant did not testify

that she was denied, low cost medical treatment, nor do the medical records refer to any such

treatment being denied.  Indeed, the medical records show Claimant to have been treated at St.

Louis Connect Care, a free clinic, on a number of occasions.

Claimant's contention that the ALJ should have recontacted her physician to request

information regarding her ability to perform work-related functions is without merit.  The ALJ has

the duty to recontact a physician only when "the evidence [] received from [a] treating physician

... is inadequate for [the ALJ] to determine whether [the claimant is] disabled." 20 C.F.R. §

404.1512(e); Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (ALJ is required to recontact

medical sources only if the available evidence does not provide an adequate basis for determining

the merits of the disability claim).  See also Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)

("Although that duty [to fully develop the record] may include re-contacting a treating physician

for clarification of an opinion, that duty arises only if a crucial issue is undeveloped.").  In the

matter under consideration, substantial evidence establishes that the ALJ had sufficient evidence

to determine whether Claimant is disabled by obtaining the testimony of the medical expert.  As

such, the ALJ was not required to recontact any doctor.  See Tellez v. Barnhart, 430 F.3d 953,

956-57 (8th Cir. 2005) (holding that the ALJ was not required to obtain additional medical

opinions where "there [was] no indication that the ALJ felt unable to make the assessment he did

and his conclusion [was] supported by substantial evidence."). The undersigned finds that the ALJ's decision is supported by substantial evidence, and thus the ALJ was not required to recontact any doctor of record.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.    Vocational Expert Testimony

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed because the expert relied on the RFC.

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant. The question must "precisely set out the claimant's particular physical and mental impairments." Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997). As discussed above, the ALJ found that the medical record is devoid of any doctor finding or imposing any significant physical limitations upon Claimant's functional capacity during the relevant time period. When formulating Claimant's RFC, the ALJ gave Claimant all possible benefit of the doubt with respect

to her ability to perform her past relevant jobs and determined that Claimant can perform

sedentary work not requiring climbing of ropes, ladders, or scaffolds; doing more than occasional

climbing of ramps and stairs; or having concentrated or excessive exposure to extreme heat or to

unprotected heights or dangerous moving machinery.

In addition, the undersigned notes that the ALJ based his hypothetical question on medical

evidence contained in the record as a whole. Giving consideration to the medical evidence as a

whole, the ALJ limited Claimant to sedentary exertional jobs. Accordingly, Claimant's claim that

the hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the

RFC should be denied. This claim is without merit inasmuch as the hypothetical included those

impairments the ALJ found credible. A proper hypothetical must include only those impairments

accepted as true by the ALJ. Pearsall, 274 F.3d at 1220. Furthermore, an ALJ may omit alleged

impairments from a hypothetical question posed to a vocational expert when "[t]here is no

medical evidence that these conditions impose any restrictions on [the claimant's] functional

capabilities." Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, an ALJ may omit

alleged impairments from a hypothetical question when the record does not support the claimant's

contention that his impairments "significantly restricted his ability to perform gainful

employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table

decision). The ALJ did not include the alleged impairment and subjective complaints that he

properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may

exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a

proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as

a change account clerk, machine tender, and light production assembler with such jobs existing in

significant numbers in the local and national economies.  The vocational expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform unskilled work at the limited sedentary level of exertion.  Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled.  Id.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

C.    Post-Hearing Medical Records

The undersigned finds that the additional medical records from May 27, 2009, to February 8, 2010, and the representative letter submitted by Claimant after the hearing do not alter the outcome of this opinion.  (Tr. 244-45, 374-432).  Indeed, the undersigned notes that these records were part of the record before the Appeals Council prior to the Appeals Council finding no basis for changing the ALJ's decision and denying Claimant's request for review of the ALJ's decision.  (Tr. 1-6).  Thus, the undersigned finds that the treatment notes and the letter add nothing new to the record regarding Claimant's alleged disability.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case

differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman\
UNITED STATES MAGISTRATE JUDGE

Dated this  6th  day of July, 2012.